UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

Mark N.,                                                )
                                                        )
                    *Plaintiff*,                        )
                                                        )         Case No. 19 CV 50261
v.                                                      )
                                                        )         Magistrate Judge Lisa A. Jensen
Andrew Marshall Saul,                                   )
Commissioner of Social Security,                        )
                                                        )
                    *Defendant*.                        )

## MEMORANDUM OPINION AND ORDER

Plaintiff Mark N. brings this action under 42 U.S.C. § 405(g) seeking reversal or a remand of the decision denying his disability insurance benefits. The parties have consented to the jurisdiction of a United States Magistrate Judge for all proceedings pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the Commissioner's decision is reversed, and this case is remanded.

### I. Background[1]

Plaintiff submitted his application for disability insurance benefits in September 2016. Plaintiff alleged disability due to lumbar disc problems, post-stroke cognitive issues, encephalomalacia, and learning disabilities with an alleged onset date of December 20, 2015. Plaintiff's claim was initially denied on January 25, 2017, and upon reconsideration on May 11, 2017. Plaintiff filed a written request for a hearing, and the Administrative Law Judge ("ALJ") held a video hearing on August 16, 2018. Plaintiff appeared in Rockford, Illinois, represented by

---

[1] The following facts are only an overview of the medical evidence provided in the administrative record.

an attorney, and testified at a hearing before the ALJ. The ALJ also heard testimony from Matthew E. Sprong, a vocational expert.

At the time of the hearing, Plaintiff was 55 years old. *See* R. 84. He testified that he lives with his sister in a rental unit and that she pays the bills for the household.[2] R. 49. Plaintiff's highest level of education was sophomore year of high school. R. 45. Plaintiff testified that he worked as a foreman for 10 years. R. 46. It was established that he had worked as a carpenter and a plumber. R. 74.

Plaintiff's medical history includes two strokes, one in 2009 and the other in 2012. R. 309-17. Plaintiff's second stroke was related to his uncontrolled diabetes, dyslipidemia, and hypertension. R. 311. The record did not include any medical records from Plaintiff's first stroke. Plaintiff also underwent three back surgeries. In 2002, he underwent a posterior fusion. R. 1419. In June 2015, he underwent an L3-4 laminectomy. R. 390-91. In October 2017, he underwent an L2-3 laminectomy and L3-4 revision hemilaminectomy. R. 1441.

Regarding his bodily pain, Plaintiff testified that, as long as he is not doing physical work, he feels "fine." R. 54. He testified that it is hard "getting up in the morning, walking and stuff, going to the bathroom." R. 57. During the hearing, Plaintiff struggled to explain how his back pain felt, and ultimately described it in this way: "It feels like it's tight in there and largely if I'm bending over, if I'm lifting. You can't. You try to lift something, and you know you can't lift nothing." R. 53, 62-64. When asked if his pain felt like a burning or stabbing sensation, he replied affirmatively. R. 62-63. Plaintiff testified that he also struggles with insomnia. He explained that

---

[2] The record does not reflect the exact date that Plaintiff moved in with his sister, but in May 2017 he was preparing to move in with her due to his financial problems and, as of January 2018, he was residing with her. R. 257, 262, 1174.

he takes sleeping pills that help some of the time. On the nights they do not help, he gets 3-4 hours of sleep. He testified that when he was working, he did not have sleep-related issues. R. 70-71.

Plaintiff testified that his back problem was due to an injury at work and that his workers compensation claim is fully resolved. R. 77. Plaintiff explained that he had a functional capacity evaluation done for his back and thereafter was sent back to work. He was back at work for two months before he re-injured his back. R. 55. He testified that, since the functional capacity evaluation was done, his back pain has gotten "a little worse." R. 56.

Plaintiff testified that some days his back hurts worse than others. To help with the pain, he will lay on his back with an icepack on his back, practice stretches he learned in physical therapy, walk around the house standing up straight, and do anything else to make himself comfortable. R. 58. When asked about medications, Plaintiff stated that he takes medication for his diabetes, but does not take medication for his back because "they're too dopey" and he did not want to "start messing around with that kind of stuff." R. 63-65, 68. He testified that, in 2017, he received injections in his back which, instead of alleviating pain, made it worse. R. 53. When Plaintiff informed his doctor that the injections did not help, she suggested back surgery. R. 63. He testified that he had been recommended back surgery to try to help relieve the nerve pain he was experiencing in his left leg, though he was told that it would not be a permanent fix. R. 61. Plaintiff's third and most recent back surgery was performed in October 2017. R. 63.

Regarding his cognitive issues, Plaintiff testified that he finds it hard to focus on one thing at a time and has memory issues. R. 49, 60. As an example of his memory issues, he stated that he often forgets what he has watched on TV and has difficulty following the plot of a movie because he misses so many things. R. 49-50. He stated that he has trouble keeping track of which doctors he has seen. R. 65. In order to remember what his doctors have directed him to do, Plaintiff testified

3

that he writes down his medications on paper and is intentional about trying to understand and follow their directions. R. 67. He explained his method for taking his diabetes medications is to line them up on his dresser in the order he needs to take them over the course of the day. When he gets these medications refilled, he writes them on a piece of paper and shows the pharmacist because he has trouble remembering the names. R. 68-69.

When asked how he spends his days, Plaintiff testified he watches TV or sits outside, barbeques, and may go to the grocery store. He stated that he no longer has hobbies, and on some days he does nothing. R. 59. He testified that he helps out with chores around the house, including a little cooking and cleaning, and does some yardwork. R. 49, 51-52.

Plaintiff testified that, even prior to his recent decline, he struggled with doing any paperwork for his job and was not good with computers. He explained that he was good with his hands. R. 47-48. He stated that, even 5-10 years ago, he would have had difficulty working a cash register because there are "just too many things that fill [his] mind" and he "just couldn't concentrate on one thing." R. 47. Plaintiff testified that, from December 2015 on, even if he did not have his physical problems and could work as a carpenter, he would have difficulties with following the instructions of his employer. R. 48. He stated that if an employer gave him a few things he had to do in a workday, he would have difficulty keeping track of those things over an 8-hour period. R. 69.

A vocational expert ("VE") testified at the end of the hearing. The VE, assuming a hypothetical individual with Plaintiff's age, education, and work experience, and assuming they were limited to light work with mental limitations of performing simple, routine, repetitive tasks and simple work-related decisions, testified that it would not be possible to perform either of Plaintiff's past jobs. Instead, the VE testified that such an individual could perform other work as

4

a housekeeping cleaner, cashier, or routing clerk. R. 79-80. The VE stated that the maximum permissible time off task would be 10%, and the maximum permissible number of absences would be approximately 1 per month. The VE further testified that an employer needing to remind an individual about tasks to be performed in light, unskilled work would likely be tolerated up to 2 times before becoming problematic. R. 81-82.

In October 2016, Plaintiff underwent a neuropsychological evaluation conducted by Dr. Colin Brietzke, Plaintiff's consultative examiner. R. 1085-1100. Dr. Brietzke conducted an interview with Plaintiff and administered numerous tests, which measured a variety of cognitive abilities. Dr. Brietzke diagnosed Plaintiff with Major Neurocognitive Disorder Due to Vascular Disease, Borderline Intellectual Functioning, Generalized Anxiety Disorder, and Alcohol Use Disorder (Moderate). R. 1087. Dr. Brietzke determined that Plaintiff's intellectual ability was likely to be a substantial limiting factor to his ability to function without assistance and maintain employment, and that his IQ had likely declined since his stroke. R. 1086. He noted that Plaintiff's intellectual deficits limited his ability to discern differences in his functioning before and after his strokes, and that he was a poor informant, despite making apparent efforts to answer all interviewer questions. R. 1090. Dr. Brietzke wrote that both testing and conversation revealed Plaintiff did not recognize his substantial level of impairment. R. 1090. Dr. Brietzke concluded that Plaintiff's previous cognitive functioning was in the low average range and his current measurement was within the borderline range, representing a decline in functioning. R. 1091. Dr. Brietzke concluded his report with 11 different recommendations, including: that Plaintiff follow up with his physician to better understand the impact of his health on his cognitive functioning and risk of future heart attack or stroke; that Plaintiff's reported unilateral weakness be assessed by a neurologist; that Plaintiff is cognitively unable to perform in the same capacity as he had in previous employment,

5

and would have distinct challenges learning a new, more menial job; that Plaintiff continue to pursue social security benefits; and that Plaintiff would do best in an employment position with limited and consistent demands.[3] R. 1094-97.

In January 2017, Plaintiff underwent a psychological evaluation conducted by Dr. Julie Young, an agency consultative examiner. R. 1102-05. Dr. Young conducted a 40-minute interview with Plaintiff, asking about topics such as medical history, familial status, and educational history. R. 1102-03. Dr. Young also briefly assessed Plaintiff's cognitive abilities and diagnosed him with Unspecified Neurocognitive Disorder. R. 1104.

On October 19, 2018, the ALJ issued a partially favorable decision finding Plaintiff disabled beginning January 6, 2018. The ALJ found that Plaintiff had the following severe impairments: degenerative disc disease of the lumbar spine, neurocognitive disorder, borderline intellectual functioning, and anxiety disorder. The ALJ determined that Plaintiff's impairments did not meet or medically equal the severity of a listed impairment. The ALJ concluded Plaintiff had a moderate limitation in understanding, remembering, or applying information; and maintaining concentration, persistence, or pace at step two of the evaluation process. The ALJ concluded that Plaintiff had the residual functional capacity ("RFC") to perform light work, except he could lift/carry and push/pull 20 pounds occasionally and 10 pounds frequently; sit, stand, walk for six hours in an eight-hour workday; frequently climb ramps/stairs, kneel, crouch, and crawl; occasionally stoop; and never climb ladders, ropes, or scaffolds. The ALJ further concluded that Plaintiff was limited to performing simple, routine and repetitive tasks and making simple work-

---

[3] Dr. Brietzke also recommended: that Plaintiff see a therapist experienced with substance abuse treatment; that Plaintiff consider pharmacologic interventions; that Plaintiff access vocational rehabilitation programming; that Plaintiff utilize certain strategies to help compensate for his inattention; that Plaintiff utilize particular strategies when managing multiple tasks simultaneously; and that Plaintiff engage in brain exercises to help recover from previous damage. R. 1094-1097.

related decisions. The ALJ found that, prior to January 6, 2018, there were a significant number of jobs that existed in the national economy that he could perform.[4] On January 6, 2018, Plaintiff's age category changed and, as a result, no jobs existed in the national economy that he could perform. The ALJ concluded that he was not disabled prior to January 6, 2018 but became disabled on that date and had continued to be disabled through the date of the decision.

Plaintiff filed a request for review of the hearing decision with the Appeals Council, who denied review on August 19, 2019. On October 10, 2019, Plaintiff filed a complaint with the Court requesting judicial review of the Commissioner's adverse decision.

## II. Standard of Review

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). If supported by substantial evidence, the Commissioner's factual findings are conclusive. *Id*. Substantial evidence exists if there is enough evidence that would allow a reasonable mind to determine that the decision's conclusion is supportable. *Richardson v. Perales*, 402 U.S. 389, 399-401 (1971). Accordingly, the reviewing court cannot displace the decision by reconsidering facts or evidence, or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

However, the Seventh Circuit has emphasized that review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (a "mere scintilla" is not substantial evidence). A reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). Even when

---

[4] Although Plaintiff had testified during the hearing that he would have difficulty working a cash register due to his concentration issues, the VE testified later in the hearing and listed a cashier as one of the jobs that Plaintiff could perform. The ALJ adopted the VE's testimony in his assessment of the types of jobs that Plaintiff could have performed prior to January 6, 2018. R. 29, 47, 80.

adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not build an accurate and logical bridge from the evidence to the conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). Moreover, federal courts cannot build a logical bridge on behalf of the ALJ. *See Mason v. Colvin*, No. 13 C 2993, 2014 WL 5475480, at *5 (N.D. Ill. Oct. 29, 2014).

### III. Discussion

Plaintiff raises four arguments: (1) the ALJ erred in evaluating the weight to be given to the opinion of Dr. Colin Brietzke; (2) the ALJ did not evaluate Plaintiff's mental RFC in accordance with SSR 96-8P; (3) the ALJ did not evaluate Plaintiff's physical RFC in accordance with SSR 96-8P; and (4) the ALJ did not evaluate Plaintiff's allegations in accordance with SSR 15-3P.

### A. Physical RFC

The Court will first address Plaintiff's argument concerning the physical RFC because it can be dispensed with more quickly. In support of his argument that the ALJ did not evaluate his physical RFC in accordance with SSR 96-8P, Plaintiff raises four issues. First, Plaintiff argues that SSR 96-8 requires that the ALJ provide a basis in the record for his physical RFC finding. Pl.'s Br. at 8, Dkt. 13. The Commissioner argues that it is evident that the specific limitations came from the opinion of Dr. Bilinsky, a state-agency reviewing doctor, because the RFC assessment virtually mirrored Dr. Bilinsky's opinion from May 2017. Def.'s Resp. at 9-10, Dkt. 27; *see* R. 109-11. He asserts that, although the ALJ did not explicitly cite or credit Dr. Bilinsky's opinion, the Court should read the ALJ's decision commonsensically. *Id*. at 10. This Court agrees. *See Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999) ("When a claimant argues that there are fatal gaps . . . in the administrative law judge's opinion, thus appealing to the important principle of

administrative law that the agency provide a rational articulation of the grounds of its decision, we give the opinion a commonsensical reading rather than nitpicking at it.") (internal citations omitted). A commonsensical reading of the ALJ's decision, along with the record, demonstrates that the ALJ's RFC assessment was adopted from Dr. Bilinsky's opinion in every respect except one, and in that one respect the ALJ adopted a more limiting restriction.[5] The Court finds the ALJ's failure to cite directly to the state-agency reviewing doctor's opinion does not warrant a remand.

Second, Plaintiff argues that the ALJ was not qualified to "determine the validity" of Plaintiff's July 2016 functional capacity examination ("FCE") with his "lay opinion." Pl.'s Br. at 8, Dkt. 13. Plaintiff explains that, as a result of the ALJ's rejection of nearly every medical opinion of record, he interpreted raw medical data and translated it into functional restrictions. As a result, Plaintiff argues, the ALJ's finding that the July 2016 FCE was inconsistent with the record was not supported by substantial evidence. Pl.'s Reply at 10-11, Dkt. 28. The Commissioner argues that the ALJ is empowered to assess whether medical opinions are consistent with the underlying medical evidence, which is what he did here. Def.'s Resp. at 11-12, Dkt. 27. The Commissioner is correct: the ALJ functions as the agency's factfinder, so assessing whether the opinion was consistent with the record was within the ALJ's purview. *See Gibbons v. Saul*, 801 F. App'x 411, 416 (7th Cir. 2020); *Primm v. Saul*, 789 F. App'x 539, 545 (7th Cir. 2019); *Lafayette v. Berryhill*, 743 F. App'x 697, 699 (7th Cir. 2018); *Loveless v. Colvin*, 810 F.3d 502, 507 (7th Cir. 2016). The Court finds the ALJ's assessment of the 2016 FCE did not involve him "playing doctor," and, as a result, does not warrant a remand.

---

[5] Where Dr. Bilinsky opined that Plaintiff could occasionally climb ladders, ropes, and scaffolds, the ALJ concluded that Plaintiff could never do so. R. 23, 110. Thus, though the ALJ's physical RFC was nearly identical to Dr. Bilinsky's opinion, it was more limiting in this respect.

Third, Plaintiff argues that, because two of Plaintiff's doctors (Dr. Ross and Dr. Long) recommended that Plaintiff have a sit-stand option, the ALJ was required to provide a discussion explaining why he did not include a sit-stand option in his RFC finding. Pl.'s Br. at 9-10, Dkt. 13. The Commissioner points out that the ALJ noted that Dr. Ross's 2015 opinions were from outside the period adjudicated. Def.'s Resp. at 14, Dkt. 27. The Commissioner further argues that Dr. Long's opinion was also from outside the period adjudicated. *Id*. The Court agrees that this reasoning was sufficient to explain why the ALJ disregarded the doctors' sit-stand recommendations. *See Stepp v. Colvin*, 795 F.3d 711, 719 (7th Cir. 2015) ("Because this assessment . . . predated the alleged onset of Stepp's disability . . . we do not find the assessment particularly probative of Stepp's condition during the adjudicative period."). With respect to Dr. Ross's opinion from July 2016, his recommendation of "sitting and standing as tolerated" appears to be intended as a temporary recommendation. The full quote is: "The patient will be returning for a follow-up visit after completion of his FCE. *In the meantime*, he would be capable of returning to work on a light duty basis with . . . [alternating] sitting and standing as tolerated." R. 948-49. (emphasis added). Accordingly, the Court finds that the ALJ did not need to provide additional discussion concerning a sit-stand option, so a remand is not warranted on this basis.

Finally, Plaintiff argues that the ALJ failed to assess Plaintiff's obesity in combination with all of Plaintiff's impairments. Pl.'s Br. at 10-11, Dkt. 13. The Commissioner argues that any error is harmless because Plaintiff did not show how his obesity exacerbated his conditions or affected his ability to work and because no doctor opined any limitation based on Plaintiff's obesity. Def.'s Resp. at 14-15, Dkt. 27. The Court agrees that the ALJ's oversight was harmless. The Seventh Circuit has held that an ALJ's failure to explicitly consider a plaintiff's obesity is harmless if the plaintiff did not explain how his obesity hampers his ability to work. *See Rennaker v. Saul,* 820 F.

App'x 474, 481 (7th Cir. 2020); *Stepp*, 795 F.3d at 720. Plaintiff's initial claim for disability did not include obesity, R. 85, and he points to nothing in the record to support his theory that his obesity would impact his standing and walking limitations. According to the record, he did not seek treatment for obesity, report any limiting effects of obesity, or testify that obesity affects him in any way. *See Rennaker*, 820 F. App'x at 481. As a result, any consideration of obesity by the ALJ would have been speculative and the ALJ's failure to consider Plaintiff's obesity does not warrant a remand.

*B. Dr. Brietzke's evaluation*

Plaintiff's remaining arguments (and the Commissioner's responses to those arguments) are rooted in various aspects of Dr. Brietzke's evaluation, including the neuropsychological tests he conducted, his diagnoses, and the allegations Plaintiff made during their interview. *See* Pl.'s Br. at 2-7, 14-15, Dkt. 13; Def.'s Resp. at 2-6, 8 Dkt. 27. Additionally, Plaintiff argues that any error in the ALJ's mental RFC evaluation is not harmless because, if the evidence were properly evaluated, Plaintiff would likely be found disabled. Pl.'s Br. at 6, 7, & 15, Dkt. 13. Therefore, the Court will focus on Plaintiff's first argument relating to the ALJ's evaluation of the weight to be given to Dr. Brietzke's opinion. The ALJ summarized Dr. Brietzke's opinion as follows:

> Dr. Brietzke opined the claimant could not perform in the same capacity as he had previously in terms of employment, and found his reasoning, ability to learn and benefit from supervisorial feedback and understand written/spoken instructions were all deficient to the point that he was likely to have trouble learning a new, more menial job (Exhibit 13F). He also found the claimant would likely have cognitive difficulties learning new tasks even in unskilled labor, and that his fatigue, poor spatial orientation, poor planning/organization and lack of motor dexterity would likely make consistent job performance "nearly impossible." The undersigned assigns this opinion little weight, as it is entirely inconsistent with all other evidence in the record regarding the claimant's mental abilities and limitations, such as his generally intact mental status examinations and residual daily activities.

R. 28.

11

Plaintiff advances three main arguments to support his contention that the ALJ erred in failing to give more weight to Dr. Brietzke's opinion. The Court will address each in turn.

*i. Consistency with the record*

In support of Plaintiff's argument that the ALJ erred in evaluating the weight to be given to the opinion of Dr. Brietzke, he asserts that the ALJ failed to explain how Dr. Brietzke's opinion was inconsistent with the record. Pl.'s Br. at 2, Dkt. 13. In response, the Commissioner argues that the ALJ adequately explained his reasonable view of Dr. Brietzke's report. He points out that the ALJ found Dr. Brietzke's evaluation was directly contradicted by Dr. Young's examination and Plaintiff's work history. Def.'s Resp. at 3-4, Dkt. 27.

Although Plaintiff argues that the ALJ failed to provide any discussion explaining how Dr. Brietzke's opinion was inconsistent with the record, the ALJ does make three references which provide insight into why he assigned it little weight, which are further elaborated below. However, Plaintiff is correct in the sense that the ALJ's discussion is insufficient to show that the decision to assign little weight is supported by substantial evidence. *See Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003) ("An ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record.").

*a. Dr. Young's report*

To support the assignment of little weight to Dr. Brietzke's opinion, the ALJ asserts that Dr. Young, the other consultative examiner, had considered Dr. Brietzke's evaluation when rendering her own report, yet still found Plaintiff "had essentially normal functioning (aside from some minor memory deficits)." R. 28.

The Court finds that the ALJ's use of Dr. Young's report to discount Dr. Brietzke's report is not supported by substantial evidence. As an initial matter, the ALJ did not indicate anywhere

in his opinion what weight he assigned to Dr. Young's evaluation. In addition, contrary to the ALJ's account, the Court does not find any evidence that Dr. Young considered or even had access to Dr. Brietzke's evaluation.[6] Given that Dr. Brietzke conducted the only other mental evaluation in the record, if Dr. Young *did not* have access to his report, that should have been a relevant factor for the ALJ in determining how much weight to give Dr. Young's report. *See Carlota R.M. v. Saul*, No. 18-CV-2873, 2019 WL 3410222, at *6 (N.D. Ill. July 29, 2019) ("An ALJ should not rely on a . . . medical opinion as evidence where that medical consultant has not reviewed all the pertinent evidence."). If Dr. Young *did* have access to Dr. Brietzke's report, she chose not to discuss it in her own report and, in doing so, did not explain how or why she discounted Dr. Brietzke's opinion. Without knowing how Dr. Young discounted Dr. Brietzke's opinion, the Court finds that the ALJ's reliance on Dr. Young's report to discount Dr. Brietzke's opinion is not supported by substantial evidence.

Moreover, while the ALJ and Commissioner are eager to point out that Dr. Brietzke and Dr. Young arrived at different conclusions, neither address the differences between the *content* of the evaluations that informed those conclusions. Dr. Young spent approximately 40 minutes with Plaintiff, "briefly assessed" Plaintiff's cognitive abilities, and, based on her conversation with Plaintiff and her review of four pages of information, created a 3 ½ page report (which contains two internal inconsistencies concerning relevant facts).[7] R. 1102-05. In contrast, Dr. Brietzke

---

[6] Dr. Young's report states: "The evaluator reviewed available documents, which included pages 6 and 7 of form SSA-3373-BK and a two page report from Dr. Ross dated 7/22/2016." R. 1103. It is unclear to the Court based on this statement whether Dr. Young had any other documents than the two she listed.

[7] There are two sets of contradictory statements in Dr. Young's report. First, Dr. Young reports that Plaintiff said he was never in a special education program, but later writes he reported a history of special education. R. 1103-04. Notably, the ALJ cites Dr. Young's statement that Plaintiff did not receive special education, despite the fact that it is the only place in the record claiming Plaintiff did not receive special education and that numerous other references in the record show he *did* receive special education. R. 222, 1086, 1089, 1104. Second, Dr. Young references Plaintiff's two strokes, but later incorrectly indicates that he had three strokes. R. 1102, 1104. Because Plaintiff's mental/cognitive problems are directly at issue in this case, it is important to have accurate information on topics such as Plaintiff's special education and history of strokes.

conducted an interview, reviewed Plaintiff's medical records (including data on his most recent stroke), and performed 10 neuropsychological tests on Plaintiff which informed his 11-page report. R. 1085-97. The report includes an analysis of Plaintiff's diagnoses, connections to other evidence in Plaintiff's medical record, and specific recommendations moving forward.

By her own admission, Dr. Young *briefly* assessed Plaintiff's cognitive abilities in her interview, whereas Dr. Brietzke evaluated Plaintiff's cognitive abilities using both an interview and 10 neuropsychological tests. Also, unlike Dr. Young, Dr. Brietzke referenced other evidence in the record to support his opinion. For example, Dr. Brietzke explained that Plaintiff's verbal IQ decline following his stroke was consistent with the fact that his most recent stroke was in the area of the brain involved in speech. R. 1086. With respect to the regulatory factors, these differences between the evaluations should have influenced the weight that was given to the respective opinions. *See* 20 C.F.R. § 404.1527(c)(2)(ii) ("Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at . . . the kinds and extent of examinations and testing the source has performed or ordered."); *id*. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion. The better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion."); *id*. § 404.1527(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion.")).

However, the Court finds no evidence that the ALJ sufficiently accounted for these factors, provided any explanation for discounting the significant differences between the evaluations, or even acknowledged that those differences likely contributed to the different results. *See Harris v.*

14

*Saul*, No. 18-CV-1930, 2020 U.S. Dist. LEXIS 6667, at *19-20 (E.D. Wis. Jan. 15, 2020) ("First, the ALJ's selective presentation of the objective medical evidence undermines most of the reasons he offered to differentiate between the conflicting medical opinions. Second, the ALJ illogically subjected [one doctor's] opinions to closer scrutiny than [another's]. . . Accordingly, the reasons the ALJ gave for resolving the conflict between the two consultative psychological examiner opinions are inadequate to support an accurate and logical bridge between the evidence and his conclusion."). Therefore, the Court finds that the ALJ's use of Dr. Young's opinion to discount the opinion of Dr. Brietzke is not supported by substantial evidence.

   *b. Daily activities*

   The ALJ asserts that Dr. Brietzke's opinion is inconsistent with Plaintiff's residual daily activities, but he does not provide any discussion as to *which* activities he finds inconsistent with the opinion, nor does he address *how* Plaintiff's activities are inconsistent. The Court assumes that the ALJ meant to refer to his discussion of Plaintiff's daily activities that appears earlier in his opinion:

> Despite his alleged symptoms and limitations, the claimant admitted he could watch television, shop in stores, prepare meals, do some cleaning/vacuuming/laundry, drive a car, go out alone, complete "word find" puzzles/games, visit with his father, get along with others (including authority figures) and handle stress . . . Furthermore, his sister admitted the claimant prepared meals every day, could go out alone, drove a little bit, grocery shopped once or twice a week, paid bills, handled finances, talked to others on the phone, had no trouble getting along with others, . . . could pay attention all day, completed tasks, followed written/spoken instructions well, got along with authority figures, handled stress well and routine changes okay.

R. 24.

   An ALJ "must consider not only what the claimant does, but also how the claimant goes about performing those activities and what effect the activities have on the claimant." *Willis v. Berryhill*, No. 3:17-CV-198 JD, 2018 WL 3751933, at *4 (N.D. Ind. Aug. 8, 2018). The ALJ lists

out some of Plaintiff's daily activities but fails to acknowledge the various limitations or accommodations that allow him to perform those activities. As a result, the ALJ adopted an impermissible 'sound-bite' approach to evaluating the record. *See Czarnecki v. Colvin*, 595 F. App'x. 635, 644 (7th Cir. 2015); *Craft v. Astrue*, 539 F.3d 668, 680 (7th Cir. 2008). After reviewing the limitations and accommodations associated with many of the activities listed, the Court finds that the ALJ's assertion that they are inconsistent with Dr. Brietzke's opinion is not supported by substantial evidence.

Contrary to the ALJ's characterization, Plaintiff's TV-watching habits appear to be consistent with Dr. Brietzke's opinion. As mentioned above, Plaintiff testified that he often forgets what he has watched on TV and has difficulty following the plot of a movie because he misses so many things. R. 49-50. This is consistent with Dr. Brietzke's finding that Plaintiff's measured memory performance was generally poor. R. 1085-86.

The ALJ's assessment that Plaintiff's ability to prepare meals, clean, shop, and drive was inconsistent with Dr. Brietzke's opinion is presumably due to Dr. Brietzke's finding that Plaintiff's ability to sustain attention, concentrate, and exert mental control is in the low average range. R. 1092. However, Plaintiff's engagement in these activities appears to be so minimal or infrequent that it would not contradict that finding. In terms of meal preparation, Plaintiff indicated on his 2017 function report that his condition limited him to eating soups, sandwiches, and prepared foods, and he noted that he tries to prepare his food as fast as possible – taking approximately 10 minutes. R. 254-55. With respect to cleaning, Plaintiff responded to a question about how much time it takes to do house and yard work and how often he does those things with: "very minimal may sit for a while." R. 255. Regarding his shopping habits, Plaintiff reported that he goes out once a week for "maybe" half an hour. R. 256. His sister confirmed that he "does not go anywhere

on a regular basis." R. 262. Relatedly, Plaintiff reported that his condition limits him to driving short distances. R. 253, 256. His sister also stated that Plaintiff "does drive but very little." R. 262. Based on this information, the ALJ's conclusion that Plaintiff's ability to engage in these activities contradicted Dr. Brietzke's opinion is not supported by substantial evidence.

The ALJ insinuates that Plaintiff's ability to go out alone and to visit with his father are inconsistent with Dr. Brietzke's evaluation. However, Dr. Brietzke opined that Plaintiff's interpersonal style was best characterized as being "very uncomfortable in social situations" with having little interest in or need for interacting with others. R. 1094. The fact that Plaintiff spends most of his time alone and limits his social interactions to visiting his father does not appear to be inconsistent with Dr. Brietzke's evaluation.

Although the ALJ implies that Plaintiff's ability to practice word find games is inconsistent with Dr. Brietzke's opinion, the Court is uncertain as to why. Plaintiff lists "word finds" as one of his hobbies and interests in his 2016 function report and this is the only place it appears in the record. R. 233. Presumably, the ALJ found this activity inconsistent with Dr. Brietzke's finding that Plaintiff's ability to sustain attention and concentrate was in the low average range. R. 1092. However, there is no information in the record about the context in which Plaintiff was doing the word find games and the ALJ did not inquire about this activity at the hearing. Without more information, the ALJ's reliance on this activity as being inconsistent with Dr. Brietzke's opinion may be entirely unfounded. For instance, if Plaintiff was working on word finds in small chunks of time (similar to the manner in which he shops, cleans, and drives) then it would likely be consistent with Dr. Brietzke's assessment. On the other hand, if Plaintiff was completing multiple word find games back to back or engaging in this activity for long periods of time without breaks,

this would likely be inconsistent with Dr. Brietzke's opinion. Therefore, without any additional explanation, the Court finds the ALJ's conclusion is not supported by substantial evidence.

On remand, the ALJ should bear in mind that the Seventh Circuit has frequently cautioned against likening a plaintiff's daily activities to the tasks one might be assigned in a full-time job. *See Beardsley v. Colvin*, 758 F.3d 834, 838 (7th Cir. 2014) ("…we have urged caution in equating [a claimant's daily] activities with the challenges of daily employment in a competitive environment."); *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013) ("We have repeatedly cautioned that a person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time."); *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) ("The failure to recognize [differences between activities of daily living and activities in a full-time job] is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases.").

### c. Work history

The ALJ also points to Dr. Brietzke's opinion concerning Plaintiff's mental ability to work in order to justify the assignment of little weight to Dr. Brietzke's opinion. The ALJ writes:

> Dr. Brietzke's evaluation also suggested the claimant's condition would essentially preclude any type of employment, yet his condition has been present for many years, dating back to the years during which he was successfully employed in semi-skilled and skilled construction jobs. Accordingly, this suggestion that the claimant could not work with his condition is contradicted by the claimant's actual performance of semi-skilled and skilled work while afflicted with his neurocognitive disorder.

R. 28.

The ALJ inappropriately assumes that Plaintiff's cognitive abilities were static from the time of his second stroke in December 2012 through Dr. Brietzke's evaluation in October 2016. As Plaintiff points out in his reply brief, the ALJ ignored lines of evidence demonstrating that

Plaintiff's condition had deteriorated over time. Dkt. 28 at 1-2. *See Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012) (stating that an ALJ "cannot ignore entire lines of contrary evidence"). Plaintiff testified that his symptoms had worsened over time and Dr. Brietzke found that Plaintiff experienced a substantial decline from his previous levels of functioning. R.48, 1086. Specifically, regarding his performance at work, Plaintiff reported that his supervisor had commented on his ability to understand what he was doing after his second stroke and that there were concerns about his pace and productivity as well. R. 1089. Moreover, Plaintiff had not undergone any neuropsychological evaluation prior to the one with Dr. Brietzke. As a result, the ALJ impermissibly "played doctor" and reached his own independent medical conclusion when he decided to ignore the evidence above and conclude that Plaintiff's level of impairment had remained the same throughout his employment. *See Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009) ("[C]ommon sense can mislead; lay intuitions about medical phenomena are often wrong."); *White ex rel. Smith v. Apfel*, 167 F.3d 369, 375 (7th Cir. 1999) ("Speculation is, of course, no substitute for evidence, and a decision based on speculation is not supported by substantial evidence."); SSR 86-8 ("Reasonable inferences may be drawn, but presumptions, speculations and suppositions should not be substituted for evidence").

Relatedly, the ALJ seems to employ the logic that since Plaintiff had the condition while he was employed, his condition did not impact his ability to work. However, this inference is questionable because the ALJ conveniently ignored the aspects of the record suggesting that Plaintiff had difficulties accurately assessing his limitations. As noted above, Plaintiff reported that his supervisor had expressed concern about his ability to understand what he was doing and his pace and productivity. R. 1089. Furthermore, Dr. Brietzke had found that Plaintiff's intellectual deficits limited his ability to discern differences in functioning before and after his strokes, and

that he did not seem to recognize his substantial level of impairment. R. 1090. Accordingly, even if Plaintiff believed he could work and tried to do so, his belief might not have been realistic. *See Ghiselli v. Colvin*, 837 F.3d 771, 778 (7th Cir. 2016) (attempts to work might reflect an "overly-optimistic outlook rather than an exaggerated condition"); *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) ("[E]ven persons who are disabled sometimes cope with their impairments and continue working long after they might have been entitled to benefits"). As a result, the Court finds that the ALJ's conclusion that Plaintiff's "actual performance" contradicted Dr. Brietzke's opined limitations does not constitute the substantial evidence required to support an assignment of little weight to Dr. Brietzke's opinion.

### d. Other evidence supporting consistency with the record

Notwithstanding the evidence cited by the ALJ that purportedly demonstrates how Dr. Brietzke's opinion is *entirely* inconsistent with the record, the Court finds numerous instances that prove otherwise. For example, Dr. Brietzke's neuropsychological measures found Plaintiff had mild to moderately impaired memory functioning. R. 1086. Plaintiff also reported to Dr. Brietzke that he had mild to moderate difficulties with his memory in that he often relies on notes to remember things and forgets names, and stated that his memory was always "out of sorts." R. 1089-90. This is consistent with Plaintiff's testimony at the hearing before the ALJ. Plaintiff testified that his memory issues impact his day-to-day life, and that he had spoken with his lawyer and his doctors about his memory issues before. R. 48-49. Plaintiff cited the following as examples of his memory issues: difficulty keeping track of the doctors he sees and recalling that information to his lawyer; needing to write down the names of his medications in order to remember them; lining up his diabetes medications in order on his dresser to remember when he needs to take each

one; difficulty remembering his conversations with his lawyer; and often forgetting what he has watched on TV and being unable to keep track of the plot of a movie. R. 44, 49-50, 65-66, 67, 68.

Dr. Brietzke's findings with respect to Plaintiff's memory issues are also corroborated by various notes throughout the record from Plaintiff's treating physicians and Dr. Young's evaluation. In July of 2015, one of Plaintiff's physical therapists noted that Plaintiff was a "very poor historian" and he was "advised to journal activities to identify triggers and progress with pain relief consistently." R. 752. On multiple occasions between 2012 and 2017, Plaintiff was unable to recall the names of medications he was taking or the type of back procedure he had undergone. R. 313, 633, 563, 1132, 1282. Additionally, Dr. Young found that Plaintiff demonstrated mild impairment in memory functioning. R. 1104.

Another example of the consistency of Dr. Brietzke's opinion with the record is his conclusion about Plaintiff's ability to work. Dr. Brietzke opined that Plaintiff's focus, reasoning, and mental endurance were not up to the task of his previous line of work. Further, he opined that Plaintiff's ability to learn and understand written or spoken directions were deficient to the point that Plaintiff would have distinct challenges in a new job. Regarding his ability to focus and concentrate, Plaintiff testified that, if an employer told him a few different things he had to do that day, he would have difficulties keeping track of everything over an 8-hour period. R. 69. Plaintiff explained that, even before his recent decline, he would have had difficulty working a cash register because "too many things would fill [his] mind" and he could not concentrate on one thing. R. 47. He testified that he found it hard to focus on one thing at a time, even when watching TV. R. 60.

With respect to Plaintiff's ability to learn, there are two doctors' notes in the record that are consistent with Dr. Brietzke's opinion. During an ER visit in 2015, a doctor met with Plaintiff to discuss practicing better diabetes self-management, and he expressed concern to the doctor

21

about his ability to learn how to do so. R. 1294. Additionally, in an initial physical therapy evaluation, the physical therapist noted that one of Plaintiff's activity limitations and participation restrictions would be "learning and applying knowledge." R. 1175. Concerning Plaintiff's ability to understand written and spoken directions, Plaintiff testified that, even without his physical problems, if he were to return to work as a carpenter, he would have difficulty following his boss's instructions and following through with them. R. 48. On Plaintiff's function report, when asked how well he follows spoken instructions, he wrote: "none at all – limited to easy instructions." R. 234.

The above examples demonstrate that, contrary to the ALJ's characterization of Dr. Brietzke's opinion, his evaluation and findings find support throughout the record. Accordingly, the ALJ's bases for discounting Dr. Brietzke's opinion – that it was *entirely* inconsistent with the record – is not supported by substantial evidence. On remand, the ALJ should consider these apparent consistencies in his evaluation of Dr. Brietzke's opinion. *See Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013) ("An ALJ cannot rely only on the evidence that supports [his] opinion.").

*ii. Neuropsychological testing*

Plaintiff next argues that the ALJ erred in his evaluation of the weight given to Dr. Brietzke's opinion because Dr. Brietzke provided the only opinion that was based on neuropsychological testing, and the ALJ was not qualified to determine the validity of these tests. Pl.'s Br. at 3, Dkt. 13. Plaintiff did not elaborate on this argument further, and the Commissioner did not appear to address this in his brief.

Notably, the ALJ did rely on Dr. Brietzke's test results in making the determination as to whether Plaintiff met or equaled the criteria for listing 12.05, R. 22, and agreed with Dr. Brietzke's

diagnosis of borderline intellectual functioning, R. 18, but apparently disregarded the remaining portions of Dr. Brietzke's opinion. Regardless, as the Court has already discussed above, there is no evidence that the ALJ sufficiently accounted for the kinds and extent of examinations and testing that Dr. Brietzke performed. *See* 20 C.F.R. § 404.1527(c)(2)(ii) ("We will look at . . . the kinds and extent of examinations and testing the source has performed or ordered."). On remand, the ALJ should discuss this relevant factor in his analysis.

*iii. Regulatory factors*

Lastly, Plaintiff argues that the ALJ erred in his evaluation of the weight given to Dr. Brietzke's opinion because the ALJ failed to discuss the regulatory factors. Pl.'s Br. at 3-4, Dkt. 13. The Commissioner responds that an ALJ need not discuss all of the regulatory factors in considering what weight to assign to a medical opinion so long as the ALJ provides sufficient reasons. Def.'s Resp. at 4-5, Dkt. 27. Yet, as explained above, the Court finds no evidence that the ALJ sufficiently accounted for multiple highly relevant factors, including Dr. Brietzke's knowledge of Plaintiff's impairments, the kinds and extent of testing Dr. Brietzke performed, the relevant evidence Dr. Brietzke presented to support his opinion, and the consistency with the record as a whole. *See* 20 C.F.R. § 404.1527(c)(2)(ii)-(c)(4). Even if there were reasons for giving Dr. Brietzke's opinion little weight, the ALJ still should have considered the *relevant* regulatory factors. *See Gerstner v. Berryhill*, 879 F.3d 257, 263 (7th Cir. 2018) ("[E]ven if there were sound reasons for refusing to give Dr. Callaghan's opinions controlling weight, the ALJ still erred by assigning his opinions little weight without considering relevant regulatory factors."). On remand, the ALJ should discuss and consider these relevant factors in his evaluation of Dr. Brietzke's opinion.

For the above reasons, the Court finds that the ALJ's evaluation of Dr. Brietzke's opinion justifies a remand. In remanding this case, the Court is not indicating that this issue must be resolved in a particular way. Because the reason for remanding this case is the ALJ's evaluation of Dr. Brietzke's opinion, on remand the ALJ should consider re-visiting the RFC limitations with a fresh eye and should, with the help of an appropriate medical expert, consider the cumulative effect of all the alleged impairments and limitations.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is granted, the Commissioner's motion is denied, and the case is reversed and remanded for further proceedings consistent with this opinion.

Date: April 1, 2021                    By: _____
                                            Lisa A. Jensen
                                            United States Magistrate Judge